UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>REYMUNDO SAUCEDA,<br><br>Defendant. | 4:16-CR-40083-01-KES<br><br>REPORT AND RECOMMENDATION ON DEFENDANT REYMUNDO SAUCEDA'S MOTIONS TO SUPPRESS<br><br>[DOCKET NOS. 105, 107 AND 109] |

Defendant Reymundo Sauceda is before the court on a superseding indictment charging him with conspiracy to distribute a controlled substance (methamphetamine). See Docket No. 84. Mr. Sauceda has filed three motions to suppress. See Docket Nos. 105, 107 and 109, along with accompanying supporting briefs (Docket Nos. 106, 108, 110 and 135).[1] The United States ("government") resists the motions. See Docket Nos. 111, 112, 113 and 134. These matters have been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, United States District Judge.

---

[1] Mr. Sauceda and the government each filed a supplemental brief after the evidentiary hearing.

**FACTS**

An evidentiary hearing was held on September 12, 2017.  Mr. Sauceda was present in person along with his counsel, David Palmer.  The government was represented by its Assistant United States Attorney, Connie Larson.  Four witnesses testified and ten exhibits were received into evidence.  From this testimony and these exhibits, the court makes the following findings of fact.

The events which form the basis for Mr. Sauceda's motions to suppress occurred in a short time span between July, 18, 2016, and July 26, 2016.  But the history of the investigation conducted by the Sioux Falls Area Drug Task Force (the Task Force) regarding Mr. Sauceda's involvement in drug trafficking, which culminated in Mr. Sauceda's arrest on July 26, 2016, is much lengthier.

Mr. Sauceda's involvement in drug activity came to the attention of law enforcement in South Dakota as early as 2007, when Mr. Sauceda was convicted of possession of ½ pound but less than one pound of marijuana.  Exhibit 4.  Mr. Sauceda correctly notes this was not a drug trafficking charge, but the government counters that ½ pound of marijuana is generally recognized as more than a person keeps on hand for personal use.  Next, in 2009, Mr. Sauceda was convicted of possession with intent to distribute a pound or more of marijuana.  Exhibit 5.

Dan Byron, a South Dakota DCI Agent who testified at the evidentiary hearing, explained that another member of the task force (DEA Agent Minten) learned further information about Mr. Sauceda from Texas authorities in the spring of 2014.  In 2014, Mr. Sauceda and another individual were stopped in

a traffic stop in Texas in a vehicle registered to Mr. Sauceda. The other individual in the vehicle was in possession of $16,000 in cash and claimed he was in Texas to purchase vehicles for his South Dakota car lot. A drug dog was summoned and alerted to the vehicle, but no drugs were found.

Also in the spring of 2014, Agent Byron interviewed a confidential informant (CI) in Sioux Falls. The CI had purchased large amounts of methamphetamine from Mr. Sauceda beginning in 2013. This CI had provided reliable information in the past, and made statements against the CI's own penal interest.

In the spring of 2016, a different source of information (SOI) told Agent Byron the SOI obtained methamphetamine beginning in 2015 from Mr. Sauceda and a co-defendant in this pending case, Martin Rios. This SOI had also provided reliable information in the past and provided the information against the SOI's own penal interest.

On July 14, 2016, a search warrant was served on a home in Sioux Falls. The occupants fled the home before the warrant was served. During the search of the home, law enforcement found $17,711 in cash and a small amount of marijuana. Sioux Falls police in an unmarked vehicle attempted to apprehend the vehicle in which at least one of the occupants fled, but were unsuccessful. The occupants of the home were, however, arrested later that evening. Both became confidential informants. The male became CI # 16-5144 and the female became CI # 16-5143. For the remainder of this opinion, the court refers to them simply as CI 43 and 44.

It was later learned that as she fled the home and drove away in the vehicle, CI 43 grabbed a backpack containing drugs. She discarded the backpack in a random, nearby yard as she fled the scene. An ordinary citizen found the backpack and turned it in to a fire station. The fire station personnel notified law enforcement of the backpack and its contents. Uniformed police arrived at the fire station and confirmed the backpack contained 6.51 pounds of methamphetamine and 1.7 pounds of cocaine.

Later that evening after CI 43 and 44's home had been searched and they had been arrested, they were interviewed at the law enforcement center. CI 44 identified the backpack and claimed ownership of it and the drugs it contained. CI 44 asserted Mr. Sauceda was the source of the drugs, and that Mr. Sauceda had delivered the drugs to South Dakota a few weeks earlier. CI 44 explained the cash found in the home was proceeds from the sale of a portion of the drugs that had already been sold. At the time of the search warrant on the home, CI 44 had prior felony convictions and was on parole. Agent Glenn testified that CI 44 may have also been on federal supervised release. CI 44 was not released on bond after this arrest.

CI 43 was also arrested, booked into jail and interviewed by law enforcement following the search of the home. Before CI 43's interview, officers were unsure of the extent of CI 43's involvement in drug trafficking. The officers did know that in January, 2016, a package with CI 43's fingerprints on it had been mailed from Sioux Falls to McAllen, Texas. The package contained $12,000 in cash and was intercepted and seized by the

Postal Inspector in McAllen.  A different package with Mr. Sauceda's fingerprints on it was mailed from Sioux Falls to McAllen in January, 2016. That package contained $13,000 in cash and was also intercepted and seized by the Postal Inspector in McAllen.

CI 43 was eventually charged for possession of the marijuana found in the home—a misdemeanor charge.  Agent Glenn explained that law enforcement encouraged both CI 43 and 44 to cooperate.  Before agreeing to do so, CI 43 and 44 wished to speak to each other.  The officers allowed CI 43 and 44 to speak to each other, but officers remained in the room during the conversation, and did not allow CI 43 and 44 to discuss their "story."  CI 43 expressed her desire to be released because she had two children at home whose care she was worried about.

CI 43 agreed to become an informant.  Agent Glenn explained that the tone of his conversations with CI 43 were cooperative.  He described CI 43 as intelligent and articulate, though he did not know CI 43's educational or psychological background.  Agent Glenn perceived that CI 43 was literate, because CI 43 was capable of reading along with him when they completed the paperwork necessary for CI 43 to become a CI.  Also, during the course of the investigation, CI 43 provided various written documents to Agent Glenn. During his conversations with CI 43 about becoming an informant, Agent Glenn indicated he would make CI 43's cooperation known to the prosecutor, but could make no promises to CI 43 about what consideration the prosecutor would give in exchange for CI 43's cooperation.  Agent Glenn agreed, however,

that whatever benefits would be bestowed upon CI 43 or 44 as a result of CI 43's cooperation would be bestowed by the prosecutor, and that CI 43 agreed to become a CI with the "hope" that the prosecutor would be happy with her cooperation. Agent Glenn categorically denied that CI 43 ever received any monetary compensation for her cooperation with law enforcement.

CI 43 agreed to place recorded calls to Mr. Sauceda. Those recorded calls occurred between July 18, 2016, and July 26, 2016. This court has read the transcripts of all the calls (Exhibit A). Agent Glenn described the procedure that he used to facilitate the recorded calls. First, CI 43 was not incarcerated, so she was free to go about normal daily life during this time frame. Agent Glenn instructed CI 43 to avoid communicating with Mr. Sauceda unless CI 43 was in police presence. In other words, if Mr. Sauceda called or texted CI 43, CI 43 was not to respond, but was instead instructed to wait until CI 43 was in Agent Glenn's presence, then call Mr. Sauceda back in order to facilitate the recording.

CI 43 travelled to the law enforcement center before calling Mr. Sauceda back. CI 43 provided Agent Glenn with the telephone number Mr. Sauceda had used to call her. CI 43, Agent Glenn, and another officer sat in an unmarked police car. Agent Glenn asked CI 43 to put her cell phone on "speaker" mode to facilitate recording. Agent Glenn placed CI 43's cell phone next to a digital recorder on the center console of the vehicle. Then CI 43 placed a return call to Mr. Sauceda. Both Mr. Sauceda and CI 43 spoke in English and Spanish during the recorded calls, so an interpreter was

frequently also present. Agent Glenn discussed with CI 43 the fact that the calls would be recorded before the calls occurred. He explained to CI 43 that was why the phone needed to be on speaker mode. Also, the recording device was in plain view in the car, immediately next to the cell phone.

During the course of the recorded conversations between CI 43 and Mr. Sauceda, Mr. Sauceda used five different telephone numbers to communicate with CI 43. Mr. Sauceda also instructed CI 43 to purchase a "small phone" for purposes of their telephone conversations. Agent Glenn explained a "small phone" is what most people refer to as a prepaid "burner" phone, generally believed to be untraceable.

Agent Glenn described the tone and content of the recorded conversations between CI 43 and Mr. Sauceda. At first, Mr. Sauceda's tone was more "amped up" but toward the end of the recordings, Mr. Sauceda's mood seemed calmer. The subject of the conversations was the drugs that had been brought to CI 43 and 44's home by Mr. Sauceda. Mr. Sauceda told CI 43 the amount of drugs he was talking about was five kilos of "ice" (methamphetamine) and two kilos of "coke," (cocaine) worth about $90,000. Mr. Sauceda indicated he intended to return to Sioux Falls to reclaim the drugs and/or the money for the drugs, because the people who gave him the drugs were looking for them. Mr. Sauceda explained to CI 43 that the people who owned the drugs would be behind or coming with him, looking for their drugs, and they intended to "f**ck" up anyone whom they perceived was "playing games" with them.

Mr. Sauceda also told CI 43 it was in CI 43's best interest to come up with the drugs, and if Mr. Sauceda found out someone else was selling the drugs, he himself intended to "f**ck everybody up." When CI 43 asked if Mr. Sauceda was threatening her and CI 44, Mr. Sauceda said "no, I'm not threatening, I'm just telling you how it is." Later, he explained, "I don't threat[en] nobody. These f**cking people, they ain't f**cking around. That's all I'm going to say."

Agent Glenn explained that both Mr. Sauceda and CI 44 are known to be members of the Tri-City Bombers, which is a well-known street gang in the Rio Grande Valley in Texas. The Tri-City Bombers are known to be involved in homicide, robbery, theft, drug trafficking, and weapons trafficking. In another recorded conversation, CI 43 prompted Mr. Sauceda to clarify exactly who "these people" that weren't f**cking around were—were they from the cartel? Mr. Sauceda responded, "I mean, well, yeah." Given this context, and Mr. Sauceda's comments during the recorded calls, Agent Glenn believed CI 43's safety was threatened.

On July 22, 2016, DEA Agent Gary Harvison obtained a warrant to track what the Task Force believed to be Mr. Sauceda's personal cell phone. Another member of the Task Force explained, however, that when they submitted the paperwork to Mr. Sauceda's cell phone provider (Verizon), the provider informed them that the number the Task Force believed Mr. Sauceda had been using as his personal number was no longer assigned to Mr. Sauceda. As a

result, the number for which the Task Force received the warrant was never pinged.

The final two recorded calls between Mr. Sauceda and CI 43 occurred on July 25 and July 26, 2016. Each of these calls from Mr. Sauceda was from a different phone number, and both were from numbers which he had not previously used during the recorded conversations with CI 43. During the recorded call made on Monday, July 25th, Mr. Sauceda indicated he was "barely leaving," but was on his way to Sioux Falls, and that he would arrive in Sioux Falls in about a day and a half. Because Mr. Sauceda said the same thing to CI 43 on Thursday, July 21, 2016, Agent Glenn explained the Task Force placed CI 43 in a hotel for the weekend because the tone of Mr. Sauceda's earlier calls made them worried for CI 43's safety.

On Tuesday, July 26, 2016, a criminal complaint was filed in this case in federal court, charging Mr. Sauceda with possession with intent to distribute methamphetamine. This court issued an arrest warrant for Mr. Sauceda before the close of business on July 26, 2016.

The final recorded call between CI 43 and Mr. Sauceda occurred at 7:09 p.m. on July 26, 2016. Mr. Sauceda indicated he was in Sioux City. The transcript of this conversation says "your city," but Agent Glenn explained CI 43 believed Mr. Sauceda was indicating "Sioux City." This is confirmed by a later statement in the transcript wherein Mr. Sauceda indicates he is about an hour away from CI 43. It is common knowledge that Sioux Falls, South Dakota, and Sioux City, Iowa, are approximately an hour apart.

Mr. Sauceda indicated he did not want to come into Sioux Falls, but wanted CI 43 to meet him in Sioux City. CI 43 refused. Agent Glenn believed Mr. Sauceda was attempting to lure CI 43 out of town, causing Agent Glenn further concern for CI 43's safety. At this time, the Task Force was unsure of Mr. Sauceda's whereabouts, because he had been untruthful on earlier dates about being on his way to Sioux Falls. CI 43 asked Mr. Sauceda which vehicle he was driving, but Mr. Sauceda would not directly answer. Finally CI 43 and Mr. Sauceda agreed to meet in Tea, South Dakota, later in the evening. Based on their concerns for the CI's safety, and because they wanted to locate and intercept Mr. Sauceda before he arrived to meet CI 43,[2] the Task Force agreed to request an emergency ping of the cell phone number Mr. Sauceda used to contact CI 43 at 7:09 p.m. on July 26, 2016. Neither Agent Glenn nor anyone else from the Task Force requested judicial authorization for the emergency ping. The procedure the Task Force used to conduct the emergency ping was to contact Metro Communications. In turn, Metro Communications contacted the cell phone provider to conduct the ping.

The ping of the cell phone Mr. Sauceda used at 7:09 p.m. on July 26, 2016, revealed that its location was at a street in Sioux City, Iowa, near the Hard Rock Hotel and Casino. Based on that information, Agent Minten contacted members of the Sioux City Drug Task Force to assist in finding and

_____

[2] Agent Glenn made a comment during the evidentiary hearing to the effect that, for all they knew, Mr. Sauceda could have been sitting outside the police station watching them during the last recorded telephone call on July 26, 2016.

arresting Mr. Sauceda on the warrant that had previously been issued by this court earlier in the day.

Sioux City police officer Brenton Heald is a member of the Tri-State Drug Task Force in Sioux City, Iowa. Agent Minten notified Officer Heald that, based upon the ping of the cell phone, Mr. Sauceda was believed to be in the area of the Hard Rock Hotel. Agent Minten further advised of the outstanding federal warrant for Mr. Sauceda's arrest. Officer Heald and other members of law enforcement from Sioux City were advised that Mr. Sauceda could possibly be driving a silver Mercedes. They located a silver Mercedes registered to Mr. Sauceda in the Hard Rock parking lot. Officer Heald obtained a photo of Mr. Sauceda, and confirmed with hotel personnel that Mr. Sauceda was a guest. Mr. Sauceda was not located on the casino floor. Officer Heald confirmed with the valet that the valet was in possession of the keys to the Mercedes.

Next, Officer Heald surveilled Mr. Sauceda's room and waited for him to emerge. Mr. Sauceda was arrested without incident in the hotel lobby. Officer Heald stayed with the Mercedes until another member of the Task Force obtained a warrant from a Sioux City, Iowa, judge to search it. The same officer also applied for and obtained a warrant to search Mr. Sauceda's hotel room at the Hard Rock. Mr. Sauceda was searched incident to his arrest. Four cell phones and a room key to room 318 at the Hard Rock Hotel were found on his person.

After the Sioux City Task Force obtained search warrants, they searched Mr. Sauceda's silver Mercedes and his hotel room at the Hard Rock. The Mercedes was searched at approximately 1:00 a.m. on July 27, 2016, in the Hard Rock parking lot. Agent Byron explained that CI 44, whom he believed to be reliable, had previously told Agent Byron that Mr. Sauceda used the silver Mercedes to transport drugs to South Dakota. CI 44 also told Agent Byron the silver Mercedes contained a hidden compartment for that purpose. A drug dog came to the Hard Rock and ran around the silver Mercedes, but the dog did not alert. The search of the silver Mercedes did not result in the discovery of any contraband, but the silver Mercedes did have a hidden compartment. No evidence was found in Mr. Sauceda's hotel room.

## DISCUSSION

### A.    Whether Mr. Sauceda's Arrest Must Be Quashed (First Motion to Suppress, Docket 105)

The basis for this motion to suppress is Mr. Sauceda's observation that in order to locate him at the Sioux City Hard Rock Hotel, a member of the Task Force (DCI Agent Glenn) obtained GPS tracking information  (i.e. a ping) for Mr. Sauceda's telephone with the number (605) 679-****, without a warrant. Mr. Sauceda concedes the Task Force had lawfully obtained a warrant to track one of Mr. Sauceda's cell phones, but, Mr. Sauceda observes, it was not (605) 679-**** which was lawfully being tracked—the cell phone which was lawfully being tracked was (956) 310-****.

The Task Force became aware of the existence of (605) 679-**** only shortly before Agent Glenn decided to ping it without a warrant. Additionally,

Mr. Sauceda does not contest that just hours before Agent Glenn pinged (605)-679-****, a different member of the Task Force (DEA Agent Gary Harvison) had filed a criminal complaint in federal court and had obtained a valid federal warrant for the arrest of Mr. Sauceda from this court.

Mr. Sauceda called CI 43 from (605) 679-**** and indicated he was on his way to her, looking for the drugs and money with which she had fled earlier in the month, during the execution of a search warrant on her home. Mr. Sauceda refused to disclose his location or identify the vehicle he was driving. Mr. Sauceda further indicated the people who "fronted" the drugs were members of a drug cartel and that they were not "fu**king around." Agent Glenn testified he believed the need to ping the phone was urgent, because he believed CI 43's safety was at risk and he wanted to intercept Mr. Sauceda before he arrived at the designated meeting place for the meeting with CI 43. For these reasons, even though CI 43 was placed in a hotel, Agent Glenn explained that the Task Force decided they needed to act quickly to determine Mr. Sauceda's location before Mr. Sauceda arrived for his meeting with CI 43 to discuss the return of the drugs and money which belonged to Mr. Sauceda and/or the cartel.

> **1. The Ping of Mr. Sauceda's Cell Phone After a Warrant Had Been Issued for His Arrest Did Not Implicate the Fourth Amendment.**

Though the Eighth Circuit has not directly addressed the issue, two other courts of appeal have very recently decided the Fourth Amendment is not implicated at all when a fugitive's cell phone is pinged without a warrant <u>after</u> a

warrant has been issued for his arrest.  <u>United States v. Riley</u>, 858 F.3d 1012 (6th Cir. 2017); <u>United States v. Patrick</u>, 842 F.3d 540 (7th Cir. 2017).   This court agrees.

In <u>Riley</u>, a state court in Michigan issued an arrest warrant for Mr. Riley on June 23, 2015, having found probable cause to believe that he had committed an armed robbery.  <u>Riley</u>, 858 F.3d 1013.  In order to determine Mr. Riley's whereabouts to effectuate his arrest, law enforcement officials obtained a court order requiring his cell phone provider to, among other things, provide the GPS location of Mr. Riley's cell phone.  The order was obtained pursuant to 18 U.S.C. § 2703, 3124 and 3124. <u>Id.</u> at 1014.  Information (not including the contents of communications) which is requested pursuant to these statutory provisions  does not require the government to make a showing of probable cause, but only a showing that there are "reasonable grounds to believe that    . . . the records or other information sought, are relevant and material to an ongoing criminal investigation."  <u>See e.g.</u> 18 U.S.C. § 2703(d).

Within hours of the issuance of the order, US Marshals received real-time GPS data which revealed Mr. Riley's location at a Memphis hotel.  <u>Riley</u>, 858 F.3d at 1014.   The officers went to the motel, showed Mr. Riley's photo to the front desk personnel, and the front desk personnel told them Mr. Riley had checked into room number 314 under an assumed name.  <u>Id.</u> at 1015.  The officers located Mr. Riley and arrested him.  <u>Id.</u>  He was returned to Michigan, where he was convicted.  <u>Id.</u> at 2015.  On appeal, he argued that the ping of his

phone without a warrant violated his Fourth Amendment rights, thereby rendering any evidence they found as a result fruit of the poisonous tree. Id.

The Sixth Circuit relied on its previous holding in United States v. Skinner, 690 F.3d 772 (6th Cir. 2012), that location data emitted by a voluntarily procured cell phone could not be subject to a reasonable expectation of privacy, even if the cell phone user had no reason to expect the government would compel the service provider to disclose the data. Riley, 858 F.3d at 1017 (citing Skinner, 690 F.3d at 774-75).

The Riley court emphasized that intrusion into one's home is much more likely to implicate the Fourth Amendment. Riley, 858 F.3d at 1017. The court cited Kyllo v. United States, 533 U.S. 27, 35 (2001), in which the United States Supreme Court held the use of thermal imaging devices to detect marijuana growing device inside a home constituted a search and United States v. Karo, 468 U.S. 705, 708-09 (1984), in which the Court held a tracking device placed in a shipment of chemicals, taken into the suspect's home, constituted a search. And, the Riley court acknowledged, searches inside a home without a warrant are presumptively unreasonable. Riley, 858 F.3d at 1018 (citing Karo, 468 U.S. at 715, other citations omitted).

Mr. Riley argued that whatever method they used to find him, whether GPS pinging, a cell-site simulator, etc., it intruded on his reasonable expectation of privacy and therefore required a search warrant. Riley, 858 F.3d at 1015. The parties agreed that the order issued by the state court was "not a

valid warrant that would on its own justify tracking Riley's location data." Id. at n. 3.

The district court had denied Mr. Riley's motion to suppress on *two* grounds. The first ground was the previous decision of the Sixth Circuit in Skinner. See Riley, 858 F.3d at 1016. The second ground upon which the district court relied was the basis of the previously issued warrant for Mr. Riley's arrest. Id.

On appeal, the Riley court held that Mr. Riley's Fourth Amendment rights were not violated by tracking his real-time cell phone GPS location for seven hours prior to his arrest. Id. The court held that the short-term tracking of Mr. Riley's cell phone put the case squarely within its holding in Skinner.

The court explained that pursuant to Skinner, using seven hours of GPS location data to determine a person's cell phone location, so long as it did not reveal movements inside a home (or in this instance inside a hotel room) did not cross the sacred threshold of the home and thus did not amount to a Fourth Amendment search. Riley, 858 F.3d at 1017 (explaining that an important aspect of Skinner was that the defendant's movements were visible from public vantage points). The Riley court concluded:

> [T]he government did not conduct a search under the Fourth Amendment when it tracked the real-time GPS coordinates of Riley's cell phone on the date of Riley's arrest. Skinner upheld tracking that spanned three days; here, approximately seven hours elapsed between the first ping and the time of Riley's arrest. That Riley was arrested in a motel is of no moment, for the government learned no more about Riley's whereabouts from tracking his cell phone GPS data than what Riley exposed to public view by traveling *to the motel lobby* "along public thoroughfares," Skinner, 690 F.3d at 774—even if Riley meant to keep his location a secret,

16

> one cannot expect privacy in one's public movements. And had
> Riley truly wished to avoid detection, he could have chosen not to
> carry a cell phone at all, or *to turn it off.*

Riley, 858 F.3d at 1018 (emphasis in original). Because it relied on Skinner

to affirm the district court's opinion, the full panel of the Riley court did not

discuss the effect of the outstanding arrest warrant upon the Task Force's use

of GPS tracking without a separate warrant. As discussed below, the Eighth

Circuit has at least hinted that if faced with the issue, it may agree with the

reasoning espoused by the Sixth Circuit in Skinner. United States v.

McHenry, 849 F.3d 699, 706 (8th Cir. 2017) (citing Skinner, 690 F.3d at 777-

81). It is not necessary in this instance for this this court to determine whether

Skinner rules the day, or whether the Eighth Circuit might adopt the Skinner

analysis if faced squarely with the question. Of more interest to this court in

this instance is the concurring opinion of Judge Boggs in Riley, with which this

court whole-heartedly agrees.

Specifically, Judge Boggs noted that the court's decision was bolstered by

the fact that Mr. Riley was a fugitive from justice at the time the Task Force

used the GPS tracking information to determine his exact whereabouts. Riley,

858 F.3d at 1020 (Boggs, Circuit Judge, concurring). There was a key

distinction between Mr. Riley and the defendants in Kyllo, Karo, and Skinner:

the government tracked Mr. Riley's cell phone only *after* a valid warrant for his

arrest had been issued. Id.

> [A]lthough the text of the Fourth Amendment does not itself imply
> that individuals on the run from arrest warrants have a diminished
> expectation of privacy, the Supreme Court's decision in Payton v.
> New York, 445 U.S. 573, (1980), as corroborated by significant

historical evidence of the original meaning of the Fourth
Amendment, provides strong support for the proposition that they
do.  Id. at 592-96 (holding that where law enforcement officers
have a valid *arrest* warrant and reasonably suspect that the
individual subject to arrest is inside his home, they may enter the
home and arrest the individual without first obtaining a *search*
warrant to do so).

Riley, 858 F.3d at 1020 (Boggs, Circuit Judge, concurring).

The logic of Payton was that the Fourth Amendment requires the

government to obtain a warrant before entering the arrestee's home, but

whether the warrant must be an arrest warrant or a search warrant is a

question not specifically answered by the text of the constitution.  In the case

of a fugitive, the arrest warrant suffices to interpose the magistrate judge's

determination of probable cause as between the "zealous officer and the

citizen."  Id. (citing Payton, 445 U.S. at 602-03).  Judge Boggs continued:

Surely, if the issuance of a valid arrest warrant may reasonably
require an individual to open the doors of his *home*, which stands
at the "very core" of Fourth Amendment protection, Silverman v.
United States, 365 U.S. 505, 511 (1961), then it may reasonably
require the same individual to open the doors of his *phone*—at
least so far as to disclose the longitude and latitude coordinates
emitted by a phone that the individual chooses to carry and turn
on.  Allowing law enforcement agent to track a fugitive's cell phone
location data, including GPS location data within the home, thus
falls well within the logic of Payton without contravening Kyllo or
Karo:  so long as a valid arrest warrant has been issued, law
enforcement officers who reasonably suspect that a cell phone is in
the possession of the subject of the warrant may track that cell
phone's location in order to facilitate the execution of the warrant,
without implicating the Fourth Amendment.

Riley, 858 F.3d at 1021 (Boggs, Circuit Judge, concurring).

Judge Boggs cited several factors which weigh against any expectation of

privacy in a fugitive's cell phone location information:  (1) the subject of the

surveillance is a fugitive; (2) the information gathered is location data, not call content; (3) the tracking is necessarily limited in duration and reach, i.e. for fugitives subject to an arrest warrant the duration of the surveillance will ordinarily be relatively short-term, beginning when the warrant is issued and concluding as soon as the fugitive is located; and (4) cell phone users voluntarily disclose their location data by keeping their cell phones turned on.

A criminal hiding from an arrest warrant, Judge Boggs reasoned, can hardly complain about the burden of having to evade detection without constant use of his cell phone. Riley, 858 F.3d at 1022 (Boggs, Circuit Judge, concurring). Accordingly, even setting aside the Skinner rationale, "Riley's Fourth Amendment claim fails because Riley was a fugitive from justice who lacked a reasonable expectation of privacy in his whereabouts . . ." Id.

A month before the Sixth Circuit decided Riley, the Seventh Circuit decided United States v. Patrick, 842 F.3d 540 (7th Cir. 2017). In Patrick, the defendant, Mr. Patrick, was on parole for a state conviction. He did not follow the conditions of his parole, which resulted in a warrant being issued for his arrest. Id. at 542. The Milwaukee Police Department obtained a second warrant, authorizing them to use Mr. Patrick's cell phone data to locate him for purposes of arresting him pursuant to the arrest warrant. Id.

During the course of the criminal proceedings, however, it came to light that the police did not wait for the court-authorized information to come from the phone company regarding Mr. Patrick's cell phone location data. Id. at 542. Instead, they used a "cell-site simulator" to obtain the information on

their own.  As explained by the court, cell-cite simulators "get the same sort of information that a phone company could providing its own facilities, and they get it in real time rather than waiting for the phone company to turn over data."  <u>Id.</u> at 543.

For purposes of the case, the government conceded that the use of the cell-site simulator constituted a search.  <u>Id.</u>  at 544.  Mr. Patrick asserted, however, that when it obtained the warrant, the government should have notified the judge who issued it that the officers intended to use the cell-site simulator rather than wait for phone company records in order to determine Mr. Patrick's location.  Mr. Patrick argued the government's failure to be candid with the judge invalidated the warrant altogether.  <u>Id.</u>

The Seventh Circuit declined to directly address Mr. Patrick's argument, but it rejected Mr. Patrick's challenge nevertheless.  First, the <u>Patrick</u> court analogized Mr. Patrick's case to the recently decided <u>Utah v. Strieff</u>, 136 S. Ct. 2056 (2016).  In that case, the United States Supreme Court held that a valid arrest warrant precludes suppression of evidence seized pursuant to the arrest, "even if the arrest was set in motion by officers who had neither probable cause nor knowledge of the warrant."  <u>Patrick</u>, 842 F.3d at 542 (citing <u>Strieff</u>).  The <u>Patrick</u> court concluded,

> <u>Strieff</u> tells us that, if the police had stopped Patrick's car for no reason at all and learned only later that he was a wanted man, the gun would have been admissible in evidence.  The officers who nabbed Patrick, by contrast, had both probable cause to believe that he was a fugitive from justice and knowledge of the arrest warrant.  The gun cannot be less admissible than in <u>Strieff</u>, even if we knock out the means used to track his location.

<u>Patrick</u>, 842 F.3d at 542.

Next, the <u>Patrick</u> court explicitly found the outstanding *arrest* warrant trumped any privacy interest Mr. Patrick may have had in his location or the manner in which the police figured it out.  <u>Patrick</u>, 842 F.3d at 545.  The court explained:

> A person wanted on probable cause (and an arrest warrant) who is taken into custody in a public place, where he had no legitimate expectation of privacy, cannot complain about how the police learned his location.  Recall that the cell-site simulator (unlike the GPS device in <u>Jones</u>)[3] was not used to generate the probable cause for the arrest; probable cause to arrest Patrick predated the effort to locate him.  From his perspective, it is all the same whether a paid informant, a jilted lover, police with binoculars, a bartender, a member of a rival gang, a spy trailing his car after it left the driveway, the phone company's cell towers, or a device pretending to be a cell tower, provided location information.  A fugitive cannot be picky about how is run to ground.  So it would be inappropriate to use the exclusionary rule, even if the police should have told the judge that they planned to use a cell-site simulator to execute the location warrant.

<u>Patrick</u>, 842 F.3d at 545.

This court reaches the same conclusion in this case.   Mr. Sauceda does not challenge the validity of the arrest warrant issued by this court during business hours on July 26, 2016.  Nor does Mr. Sauceda dispute that the arrest warrant was issued <u>before</u> the Task Force pinged  (605)-679-**** without a warrant.  The pinging of (605)-679-**** played no part in providing probable cause for Mr. Sauceda's arrest.  Pursuant to <u>Strieff</u>, <u>Riley</u>, and <u>Patrick</u>,

---

3 <u>United States v. Jones</u>, 132 S. Ct. 945 (2012), a case in which the United States Supreme Court held the government's entrance onto private property for placement of a GPS tracking device on a suspect's vehicle for purposes of tracking the suspect constitutes a "search" for purposes of the Fourth Amendment.

therefore, the pinging of (605)-679-**** under these circumstances does not implicate the Fourth Amendment, does not invalidate Mr. Sauceda's arrest, and does not implicate the exclusionary rule as to any evidence found as a result of the searches of Mr. Sauceda's person, vehicle, or hotel room.

### 2. Alternatively, Exigent Circumstances Excused Agent Glenn's Failure To Obtain A Warrant to Ping Mr. Sauceda's Cell Phone.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

The touchstone of the Fourth Amendment is "reasonableness," and "reasonableness" usually requires the government to obtain a search warrant before searching for evidence of a crime. Riley v. California, 573 U.S. ___, 134 S. Ct. 2473, 2482 (2014).

Without a warrant, a search is "reasonable" only if it fits into a specific exception to the warrant requirement. Id. Whether to exempt a category of search from the warrant requirement is determined by weighing "the degree to which [the search] intrudes upon an individual's privacy and, . . . the degree to which it is needed for the promotion of legitimate governmental interests." Id. at 2484. Where a search takes place without a warrant, it is the government's burden to demonstrate by a preponderance of the evidence that an exception to the warrant requirement applies. Coolidge v. New Hampshire, 403 U.S. 443 (1971); United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005).

Technology has far out-paced the development of Fourth Amendment law.  Neither the United States Supreme Court nor the Eighth Circuit has explicitly decided whether a warrant is required to obtain real-time or prospective cell-site information from a person's cell phone to discern the person's location.  The federal courts that have studied the issue are badly divided.  See e.g. United States v. Powell, 943 F. Supp. 2d 759, 767-775 (E.D. Mich. 2013) (collecting cases and concluding a warrant is necessary).

A few courts, however, have held that a person has no legitimate expectation of privacy in cell-site data because law enforcement agents could have obtained the same information by physically following the person in his vehicle on a public highway. See e.g.  United States v.  Skinner, 690 F.3d 772, 779 (6th Cir. 2012); United States v. Forest, 355 F.3d 942, 951 (6th Cir. 2004), vacated on other grounds, Garner v. United States, 543 U.S. 1100 (2005).

In the only case in which the Eighth Circuit came close to having to decide the issue, the court hinted it would follow Skinner, noting "there is substantial doubt that [the defendant] had a reasonable expectation of privacy in cell phone location information voluntarily provided to T-Mobile."  United States v. McHenry, 849 F.3d 699, 706 (8th Cir. 2017) (citing Skinner, 690 F.3d at 777-81).  But, as here, the McHenry court decided it need not answer the "serious question" of whether the defendant had a reasonable expectation of privacy in cell phone location information (and thus whether a warrant is required) because in that instance, as in this one, exigent circumstances excused law enforcement's failure to obtain one.  McHenry, 849 F.3d at 706.

Where a warrantless search occurs, the burden is on the government to show by a preponderance of the evidence that an exception to the warrant requirement applies. Coolidge, 403 U.S. 443; Kennedy, 427 F.3d at 1140. In this instance, the government argues exigent circumstances justified foregoing obtaining a warrant to ping Mr. Sauceda's phone.

"The [exigent circumstances] exception justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." United States v. Amburn, 412 F.3d 909, 915 (8th Cir. 2005) (quoting United States v. Ball, 90 F.3d 260, 263 (8th Cir. 1996)). Whether this exception to the warrant requirement has been shown is evaluated objectively, on the basis of what a "reasonable, experienced officer would believe." Id. (quoting United States v. Kuenstler, 325 F.3d 1015, 1021 (8th Cir. 2003)). An officer's subjective motivations are irrelevant. United States v. Valencia, 499 F.3d 813, 815 (8th Cir. 2007) (citing Brigham City v. Stuart, 126 S. Ct. 1943, 1948 (2006)).

In United States v. Leveringston, 397 F.3d 1112, 1115-1116 (8th Cir. 2005), the court held that the feared imminent destruction of evidence justified police entering a hotel suite without a warrant. However, the facts in that case were that evidence of drug trafficking had been observed and, upon the officers' knock on the door to the suite, an occupant looked out the window, expressed surprise, then shut the curtains. Id. Loud sounds of pots and pans banging, water running, and a garbage disposal grinding were then heard by the officers. Id.

Similarly, in Roby v. United States, 122 F.3d 1120, 1125 (8th Cir. 1997) the officers' warrantless entry into a hotel room was justified by the exigent circumstances of the imminent destruction of evidence where the defendant was in the room and was suspected of possessing narcotics that could easily be flushed down the toilet or sink. Roby, 122 F.3d at 1125. The officers in the Roby case merely entered the room and stood guard until the search warrant was secured; no search occurred. Id.

Most of the cases upholding warrantless searches based on exigent circumstances involve a reasonable belief that drugs, which are easily disposed of, are inside a dwelling place and are in danger of being destroyed because there is a person in the dwelling place with the evidence. See, e.g., Leveringston, 397 F.3d at 1115-1116; Roby, 122 F.3d at 1125.

Here, on the other hand, the reason Agent Glenn offered up as an exigent circumstance was not a fear of the destruction of evidence but rather the fear for the safety of CI 43 (and probably the officers who were expected to be involved in Mr. Sauceda's arrest, though that was articulated by Officer Heald, not Agent Glenn).[4] Agent Glenn explained they wanted to intercept Mr. Sauceda before he arrived for the meeting with the CI. Of course, law enforcement did not wish for the meeting with CI 43 to actually happen. A review of the transcript of the final call between Mr. Sauceda and CI 43 reveals that CI 43 finally agreed to meet Mr. Sauceda in Tea, South Dakota.

_____

[4] Though Agent Glenn did articulate they wanted to make sure Mr. Sauceda was not sitting outside the police station watching them as they conducted the final recorded call on the evening of July 26.

Obviously, Mr. Sauceda would have figured out that something was awry if CI 43 did not show up. The chances of Mr. Sauceda's eluding arrest were much greater if law enforcement had not known Mr. Sauceda's location.

Further, Mr. Sauceda voiced his intent to come visit CI 43 to retrieve $90,000 worth of methamphetamine and cocaine, and the proceeds of the sale of the drugs which he had already delivered, but that had already been sold in Sioux Falls. Mr. Sauceda told CI 43 that Mr. Sauceda's associates (members of a violent street gang, known for drug trafficking and murder, among other things) were either coming with him or were right behind him, and that none of them were "f**cking around."

Of course, supposedly unbeknownst to Mr. Sauceda, not only did CI 43 not have the drugs or the money, but she had no way to get her hands on them. The drugs and the money had all been seized by the police. Even had CI 43 been allowed, under the constant supervision of law enforcement, to attend the meeting with Mr. Sauceda and/or his associates, she surely would been in grave danger if she attended the meeting without the drugs and money they were coming to retrieve, and with no possible way to get them.

In the McHenry case, the Eighth Circuit declined to decide the "serious question" of whether the defendant had a legitimate expectation of privacy in his cell phone location information. McHenry, 849 F.3d at 706. Instead, it found the officers who requested and received the information without a warrant had a good faith belief that exigent circumstances excused their failure to obtain a warrant. Id. The McHenry court referenced two other cases which

allowed emergency GPS tracking of cell phone locations based upon a portion of the Stored Communications Act.  Id. (citing United States v. Gilliam, 842 F.3d 801, 805 (2d Cir. 2016); United States v. Caraballo, 831 F.3d 95, 104-06 (2d Cir. 2016)).

The portion of the Stored Communications Act which allows law enforcement to obtain cell phone location information without a warrant under exigent circumstances is found at 18 U.S.C. § 2702(c)(4).  It states:

> A provider may  . . . divulge a record or other information pertaining to a subscriber  . . . (not including the contents of communications covered by [other subsections])—
> …
> (4)to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency.

See  18 U.S.C. § 2702(c)(4).  Though it is assumed this is the method by which the Sioux Falls Task Force obtained Mr. Sauceda's cell phone location information on the evening of July 26, 2016, no such details were offered during the evidentiary hearing.  Agent Glenn simply explained that once the Task Force agreed it was an emergency situation, a request for the information made to Metro Communications.  Metro Communications then handled the details of contacting Mr. Sauceda's cell service provider and obtaining the location information, then providing the information to the Task Force.

In McHenry, the exigent circumstance which the court found justified law enforcement's request for the disclosure of the defendant's cell phone location information was that officers believed the phone was being used to traffic an underage girl for purposes of prostitution.  McHenry, 849 F.3d at

27

705.  <u>Gilliam</u> also involved a sex trafficking case in which the subject had been known in the past to physically abuse his victims.  <u>Gilliam</u>, 842 F.3d at 802.

<u>Caraballo</u> is studied with more care here because it was a drug trafficking case.  <u>Caraballo</u>, 831 F.3d at 97. After Mr. Caraballo was convicted of conspiracy to distribute cocaine, he appealed.  He challenged the district court's denial of his motion to suppress,  which had been based on his assertion that pinging his phone without a warrant in order to locate him violated his Fourth Amendment rights.  <u>Id.</u>

Mr. Caraballo had been under investigation for selling drugs.  Earlier in the morning on the day police decided to ask to track Mr. Caraballo's phone based on exigent circumstances, they found one of Mr. Caraballo's associates dead, shot execution style.  <u>Id.</u>  The government offered two possible sources of exigency to justify the warrantless ping:  (1) they reasonably believed Mr. Caraballo posed an imminent threat to law enforcement, including undercover agents and confidential informants who were involved in investigating him; and (2) the delay associated with obtaining a warrant could result in the imminent destruction or dissipation of evidence.  <u>Id.</u> at 104.   The Second Circuit found that the first reason sufficed to justify the warrantless pinging of Mr. Caraballo's phone.  <u>Id.</u>   The court explained that the brutal nature of Mr. Caraballo's associate's death led them to believe the government investigation had been discovered.  <u>Id.</u> at 105.  If that was the case, the officers had a "legitimate, good faith belief that Caraballo must be apprehended immediately to ensure that confidential informants and undercover narcotics

agents would not be exposed to an imminent risk of death or serious bodily injury." Id.

The court reaches the same conclusion in this case. Though neither CI 43 nor any of her associates had been murdered, Agent Glenn explained that Mr. Sauceda (and CI 44) were members of a street gang who were known for such violence. Mr. Sauceda asked CI 43 during one of the calls (July 19, 2016,) whether she, too, had been arrested because usually everybody gets arrested. See Exhibit A, July 19, 7:17 p.m. phone call, p. 20. He also quizzed CI 43 about why she never answered the phone when he called, or noted that he had been calling but she did not pick up. See Exhibit A, July 19, 6:41 p.m. phone call, p. 2; July 21 phone call, p. 7. Agent Glenn also explained that the tone of Mr. Sauceda's calls with CI 43 had changed, becoming more calm as his trip to Sioux Falls neared. CI 43 tried to elicit from Mr. Sauceda the reason for this change in tone, but he was not forthcoming. Exhibit A, July 25, 2016, phone call, p. 8. These things raise the question whether Mr. Sauceda was suspicious that CI 43 was an informant.

This court concludes the government has carried its burden to show exigent circumstances existed to excuse the government's failure to obtain a warrant, even assuming Mr. Sauceda had a legitimate expectation of privacy in his cell phone's cell site information—an issue which this court specifically declines to decide. The court concludes that a "reasonable, experienced officer would believe" an emergency involving danger of death or serious physical injury required disclosure without delay of information regarding the location

of Mr. Sauceda's cell phone.  <u>Amburn</u>, 412 F.3d at 915; <u>McHenry</u>, 849 F.3d at 706; <u>Caraballo</u>, 831 F.3d at 105.  No warrant was required, therefore, and Mr. Sauceda suffered no Fourth Amendment violation.

### 3. The Search of Mr. Sauceda's Person Was Incident to His Lawful Arrest.

For the reasons explained above, the pinging of Mr. Sauceda's cell phone had no effect on the validity of the pre-existing warrant which had been issued for his arrest.  It is, of course, beyond cavil that a search incident to arrest is reasonable under the Fourth Amendment.  <u>Strieff</u>, 136 S. Ct. at 2063; <u>United States v. Robinson</u>, 414 U.S. 218, 235 (1973).  A search incident to lawful arrest requires no additional justification.  <u>Robinson</u>, 414 U.S. at 235.  A lawful, custodial arrest justifies a "full search of the person . . ." without a warrant.  <u>Id.</u>  The evidence found on Mr. Sauceda's person, therefore, is admissible.

### B. Whether Evidence Found as a Result of the Search of Mr. Sauceda's Hotel Room or Vehicle Should Be Suppressed  (Second Motion to Suppress, Docket 107)

Next, Mr. Sauceda asserts the evidence found as the result of the search of his hotel room[5] and vehicle should be suppressed.  Mr. Sauceda alleges the supporting affidavits for the warrants which were obtained by Sioux City, Iowa,

---

5 Though the motion only addresses the silver Mercedes, an identical affidavit was submitted in support of a separate warrant to search the hotel room.  <u>See</u> Exhibit 2.  During the evidentiary hearing, the government represented to the court that it did not intend to introduce any evidence at trial which was found during the search of the hotel room.  Nevertheless, in the event that this circumstance should change later on, the affidavit/warrant regarding the hotel room is included in the court's discussion for the sake of completeness.

law enforcement contained materially false statements and that absent those false statements and omissions, no probable cause existed for the issuance of the warrants. Mr. Sauceda also asserts that the officer who applied for the warrant omitted material facts which, had they been supplied, would have defeated probable cause. Before the evidentiary hearing, Mr. Sauceda requested a <u>Franks</u>[6] hearing to explore the nature of the allegedly false statements in the supporting affidavits.

**1. Mr. Sauceda Did Not Make the Necessary Showing to Require a <u>Franks</u> Hearing (No Showing There Were Falsehoods or Material Omissions That Were Essential to Probable Cause Finding)**

As a preliminary matter, a defendant is only entitled to a <u>Franks</u> hearing if he makes a substantial showing that an affiant to a search warrant application knowingly or intentionally, or with reckless disregard for the truth, made false statements or omitted material facts and that the alleged statements or omissions were necessary to a finding of probable cause. <u>Franks</u>, 438 U.S. at 155-56. "Whether [the defendant] will prevail at that hearing is, of course, another issue." <u>Id.</u> at 172.

The court notified the parties in advance of the evidentiary hearing that a <u>Franks</u> hearing would not be held, absent a more persuasive presentation of facts or offer of proof at the evidentiary hearing of false statements in the affidavit that were necessary to the probable cause determination. To prevail on a <u>Franks</u> challenge, the court first determines whether the affiant officer

---

[6]<u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

intentionally or recklessly made false or misleading misstatements or omissions in support of the warrant.  United States v. Martinez-Garcia, 397 F.3d 1205, 1215 (9th Cir. 2005) (quoting Franks, 438 U.S. at 155-56).  If it finds by a preponderance that the information was deliberately or recklessly stated or omitted, the court must then inquire whether the excision of the false information or addition of the omitted material renders the affidavit "insufficient to establish probable cause."  Franks, 438 U.S. at 156.  Because a search warrant affidavit is presumed valid, see Franks, 438 U.S. at 171, the burden of proof rests on the defendant, and the government has no burden to rebut the defendant's allegations or to otherwise move forward with the evidence.

In making this determination, the Eighth Circuit has instructed that "[o]ur touchstone is 'probability' not 'certainty' and one-hundred percent reliability . . . [is] not crucial to the issuance of the warrant."  United States v. Reivich, 793 F.2d 957, 963 (8th Cir. 1986).  At issue in Reivich was whether the affiant officer committed a Franks violation when he failed to include in his warrant affidavit the fact that his drug informants had been offered leniency regarding their own pending charges.  Id. at 958.  The district court found a Franks violation but the Eighth Circuit reversed, noting that even if the affidavit was corrected to include the information, it would have supported a finding of probable cause.  Id. at 962-63.  "After all, we expect . . . judicial officers to be only neutral and detached—not naïve and ingenuous."  Id. at 963.

To prove reckless disregard for the truth, the defendant must prove that the affiant "in fact entertained serious doubts as to the truth of the affidavits or had obvious reasons to doubt the accuracy of the information therein." United States v. Clapp, 46 F.3d 795, 801 (8th Cir. 1995) (citation omitted); United States v. Williams, 737 F.2d 594, 602 (7th Cir. 1984). In Franks, the court explained that

> When the Fourth Amendment demands a factual showing sufficient to comprise "probable cause," the obvious assumption is that there will be a *truthful showing.* This does not mean "truthful" in the sense that every fact recited in the warrant is necessarily correct, for probable cause may be founded on hearsay and upon information that is received from informants, as well as on information within the affiant's own knowledge that must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

Franks, 438 U.S. at 164-65 (citations omitted, punctuation altered).

However, "failure to investigate fully is not evidence of an affiant's reckless disregard for the truth." United States v. Miller, 753 F.2d 1475, 1478 (9th Cir. 1985); United States v. Mastroianni, 749 F.2d 900, 909-10 (1st Cir. 1984); United States v. Young Buffalo, 591 F.2d 506, 510 (9th Cir.) (1979). Probable cause "does not require an officer to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence." United States v. Dale, 991 F.2d 819, 844 (D.C. Cir. 1993). The mere fact of an omission, standing alone, is insufficient to demonstrate intent or reckless disregard. United States v. Shorter, 328 F.3d 167, 171 (4th Cir. 2003) (affirming the district court's denial of relief after a Franks hearing where defendant failed to present any evidence, beyond the mere fact of omission,

that the investigator's conduct was deliberate or reckless) (quoting United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990)).

Finally, it is well established that the Franks opinion itself framed its holding as "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included *by the affiant in the warrant affidavit*, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." Franks, 438 U.S. at 155-56 (emphasis added). A Franks challenge requires the court to evaluate the *affiant's* conduct and affidavit, not that of any other law enforcement officer involved in the investigation. See also United States v. Conant, 799 F.3d 1195, 1201 (8th Cir. 2015).

In support of his motion for a Franks hearing, Mr. Sauceda initially cited three falsehoods in the affidavit supporting the search warrants for the vehicle and the hotel room, which he alleges were intentional or were made with a reckless disregard for the truth and were necessary to the finding of probable cause to search. In his supplemental brief after the hearing, he cited two more alleged falsehoods, and five alleged material omissions.

First, the affidavit states that "officers were advised [Mr. Sauceda] was believed to be making a delivery of narcotics in Sioux City, Iowa." Next, the affidavit states Mr. Sauceda had two prior felony drug trafficking convictions. The affidavit states that a court-authorized GPS location ping of Mr. Sauceda's cell-phone showed Mr. Sauceda to be in the area of [the Hard Rock Hotel and

Casino].  Next, the affidavit states that Special Agent Minten advised that prior investigation revealed Mr. Sauceda possessed firearms in furtherance of his drug activities, in violation of his probation terms/felony drug convictions. The court now explains why no <u>Franks</u> hearing was held.

In order to be entitled to a <u>Franks</u> hearing, Mr. Sauceda was required to show that the affiant intentionally or recklessly made statements which were (1) false; and (2) necessary to the finding of probable cause to search.  <u>United States v. Curry</u>, 911 F.2d 72, 76 (8th Cir. 1990).

Probable cause for an arrest and probable cause to search are distinct concepts, each requiring a showing of probabilities as to different facts and circumstances.  2 Wayne R. LaFave, <u>Search and Seizure, A Treatise on the Fourth Amendment</u>, § 3.1(b) at 8-9 (4th ed. 2004).  Although the evidence which supports a search warrant and the evidence which supports an arrest must be of the same degree of probity, the conclusions themselves are not identical.  <u>Id.</u> at 10.  Where probable cause for an arrest is concerned, the conclusion is relevant to the guilt of the accused whereas in the case of a search warrant, the conclusion is relevant to the connection the items sought have with the crime and to their present location.  <u>Id.</u>

As it relates to a search, "[p]robable cause is a fair probability that contraband or evidence of a crime will be found in the location searched." <u>United States v. LaMorie</u>. 100 F.3d 547, 552 (8th Cir. 1996)(citation omitted). "The standard of probable cause for the issuing judge is whether, given the totality of the circumstances, there is a fair probability that contraband or

evidence of a crime will be found in a particular place."  <u>Walden v. Carmack</u>,

156 F.3d 861, 870 (8th Cir. 1998) (citations omitted).  Probable cause is a

"fluid concept--turning on the assessment of probabilities in particular factual

contexts--not readily, or even usefully, reduced to a neat set of legal rules."

<u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983).

The search warrant affidavit was prepared by a member of the Tri-State

Drug Task Force, Sioux City Police Officer, Heather Albrecht.  Exhibit 2, p. 3.

Officer Albrecht indicated the information in the affidavit was gleaned from the

following sources:  DEA Agent Mark Minten, Minnehaha County Sheriff

Detective Dan Christensen, South Dakota DCI Agent Matt Glenn, South

Dakota DCI Agent Dan Byron, and Sioux City, Iowa, Police Officer Brent Heald.

Exhibit 2, p. 4.  Ms. Albrecht did not testify at the hearing, so it is unknown

how she received information from these officers (i.e. over the phone, via email,

by reading their reports, etc.).  When working on an investigation such as this

one, it is well established that the validity of the search may be based on the

collective knowledge of all the law enforcement officers involved in the

investigation, so long as there is some degree of communication between them.

<u>United States v. Gillette</u>, 245 F.3d 1032, 1034 (8th Cir. 2001).

It is also observed that the final phone call between CI 43 and

Mr. Sauceda occurred at 7:09 p.m.  Mr. Sauceda's phone was pinged after the

final phone call, and Mr. Sauceda was arrested shortly thereafter in the lobby

of the Hard Rock Hotel in Sioux City.  Ms. Albrecht prepared the supporting

affidavit for the search warrant.  Officer Heald testified the silver Mercedes was

not searched until approximately 1:00 a.m. on July 27, after the warrant was obtained. Both the officer's signature on the affidavit and the Judge's signature on the warrant are dated July 27, 2016. The logical conclusion, then, is that the affidavit was prepared in the late hours of the evening on July 26, 2016, and presented to the judge in the early morning hours of July 27, 2016.

Mr. Sauceda's first alleged falsehood is that he was not in Sioux City to *deliver* drugs, but, as definitely shown by the recorded phone calls, he was on his way to Sioux Falls to *retrieve* either the drugs that he had previously delivered to Sioux Falls, or the money for those drugs, on behalf of the cartel. Officer Albrecht's affidavit does not specify which officer relayed the information about the purpose for Mr. Sauceda's presence in Sioux City. For purposes of this opinion, the court will assume it is false.

Here, the affiant is Sioux City Police Officer Heather Albrecht. The burden is on Mr. Sauceda to show that the statement is false *and* that Officer Albrecht made the statement either knowing it was false or with a reckless disregard for the truth. Though Mr. Sauceda has identified the alleged falsehood (that he was in Sioux City to deliver drugs rather than on his way to Sioux Falls to retrieve them), Mr. Sauceda has made *no* showing that Heather Albrecht included this statement in her affidavit either knowing it was not true, or with a reckless disregard for whether it was true. In the absence of such a showing, Mr. Sauceda cannot prevail on his <u>Franks</u> claim. See <u>United States v. Wajda</u>, 810 F.2d 754, 759 (8th Cir. 1987) (defendants' <u>Franks</u> claim rejected

because they offered no witnesses or affidavits to show falsity of statement in affidavit or proof of reckless or deliberateness of alleged falsehood in affidavit).

The next falsehood alleged by Mr. Sauceda is that he had only been convicted of one felony drug *trafficking* crime, not two. This assertion fails the second half of the <u>Franks</u> test (i.e. that the statement was necessary to a finding of probable cause to search).

Mr. Sauceda is correct--he has been convicted of two felony drug crimes, but only one is a *trafficking* conviction. The technical error in the language of the affidavit, however, has no effect on the finding of probable cause to search the vehicle or the hotel room. Mr. Sauceda has two felony drug convictions. Whether they are both for trafficking or one for trafficking and the other for possession of ½ pound of marijuana makes no difference whatsoever in the determination of whether, given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime would be found in Mr. Sauceda's vehicle or hotel room.

The next false statement is that a court-authorized GPS location ping of Mr. Sauceda's cell-phone showed Mr. Sauceda to be in the area of [the Hard Rock Hotel and Casino]. This statement is indeed incorrect. As discussed in great detail above, the court-authorized ping of Mr. Sauceda's phone never occurred. The ping that did occur was *not* court authorized, but instead was an emergency ping which was conducted without a warrant. Mr. Sauceda provided no proof, however, that Officer Albrecht understood the distinction and intentionally or recklessly mislead the Iowa judge who issued the search

warrants for the Mercedes and the hotel room. But more importantly, the first sentence in the affiant's affidavit explained to the Sioux City, Iowa, judge that the Sioux City Task Force officers were assisting the Sioux Falls Task Force officers in *locating a subject with a federal arrest warrant who was supposed to be in the Sioux City, Iowa area.*

With that background in mind, this incorrect statement also fails the second half of the <u>Franks</u> test. The manner in which law enforcement determined Mr. Sauceda was in the Sioux City, Iowa area in order to effectuate his arrest had no relevancy whatsoever in the probable cause determination to search Mr. Sauceda's vehicle or hotel room. Whether agents personally followed Mr. Sauceda in their own vehicles from the moment he left his driveway in Texas, whether he was randomly spotted by a rival gambler on the casino floor at the Hard Rock who recognized Mr. Sauceda and then alerted authorities, or whether law enforcement pinged Mr. Sauceda's phone (with or without a court order or warrant) had nothing whatsoever to do with the probability contraband or evidence of a crime would be found in Mr. Sauceda's vehicle or hotel room.

Next, Mr. Sauceda asserts the statement regarding Agent Minten telling Officer Albrecht "that from a prior investigation involving Sauceda, there was creditable information that Sauceda possessed firearms in furtherance of his drug trafficking activities in violation of his probation terms/felony drug convictions," is false. Mr. Sauceda claims this is a false statement both because there is no evidence he has ever possessed firearms and because he

was not on probation at the time of his arrest. The court rejects statement in the affidavit as a basis for a <u>Franks</u> hearing.

The burden is on Mr. Sauceda to show that the statement is false and that Officer Albrecht made the statement either knowing it was false or with a reckless disregard for the truth. Though he has identified the alleged falsehoods (he didn't use firearms while conducting drug activities and he was not on probation), Mr. Sauceda has made *no* showing that Heather Albrecht either believed these statements to be false when she made them or that she made them with a reckless disregard for the truth. <u>See</u> <u>Wajda</u>, 810 F.2d at 759 (defendants' <u>Franks</u> claim rejected because they offered no witnesses or affidavits to show falsity of statement in affidavit or proof of reckless or deliberateness of alleged falsehood in affidavit).

Officer Albrecht's affidavit indicates she received this information from Agent Minten. In addition to his failure to show Officer Albrecht did not believe the information to be true, Mr. Sauceda has made absolutely no showing that the information is indeed false or that Agent Minten did not relay this information to Officer Albrecht. Indeed, Agent Byron explained during the evidentiary hearing that Mr. Sauceda is a known member of the Tri-City Bombers, a street gang which is involved in the trafficking of not only drugs but also weapons.

Additionally, Mr. Sauceda does not contest that he had prior felony drug convictions. The wording of the affiant's statement contains a slash mark, indicating it is in the alternative (i.e. that Mr. Sauceda's possession of firearms

was in violation of his probation terms <u>or</u> his prior felony drug convictions).
Mr. Sauceda, therefore, has failed to show this statement contains any
falsehood at all.

Next, after the evidentiary hearing and in his supplemental brief,
Mr. Sauceda identified several omissions which he asserts Officer Albrecht
should have included in the affidavit and which he claims, had they been
included, would have defeated probable cause.  These omissions are as follows:
(1) the recorded conversations between CI 43 and Mr. Sauceda do not contain
statements that Mr. Sauceda would be delivering drugs to Sioux Falls on July
26, 2016; (2) that Mr. Sauceda tensed up but did not resist arrest after police
officers identified themselves; (3) that Mr. Sauceda was searched immediately
after he was arrested but neither weapons nor controlled substances were
located on his person; (4) that Officer Heald located the silver Mercedes in the
parking lot at the hotel but did not make any visual observations of the
Mercedes that were suspicious; and (5) the drug dog walked around the
Mercedes but did not alert.

With regard to the first omission (that the recorded conversations reveal
Mr. Sauceda was on his way to retrieve drugs but didn't mention a delivery of
drugs) the court does not find including this statement would have defeated
probable cause.  If anything, including such a statement would only reiterate
that Mr. Sauceda had transported drugs in the silver Mercedes.  Additionally,
the warrant authorized a search for things other than drugs.  Officer Albrecht
explained that persons who traffic in drugs are also known to carry with them

not only drugs but drug proceeds, firearms, records of drug transactions, and records or indicia of their co-conspirators, customers and suppliers. The warrant authorized for the search of these things. Some of these items were of particular interest here, where Mr. Sauceda was on his way to Sioux Falls to retrieve the drugs he had delivered a few months earlier and/or the proceeds from the sale of those drugs. So, inclusion of the content of the recorded conversations between Mr. Sauceda and CI 43 would not have defeated probable cause to search.

Next, Mr. Sauceda alleges Officer Albrecht should have included the fact that he tensed up but did not resist arrest after the officers identified themselves. That Mr. Sauceda did not resist arrest has nothing whatsoever to do with whether the fruits of a crime might be found in his vehicle or hotel room.

Mr. Sauceda also asserts Officer Albrecht should have told the issuing judge that neither weapons nor controlled substances were found on his person when he was searched incident to arrest. While this fact may have tipped the scale slightly against a finding of probable cause, it would not have defeated a finding of probable cause to search Mr. Sauceda's vehicle or hotel room for evidence of drug trafficking. Drug traffickers do not necessarily carry with them on their persons at all time indicia of their trade.

Mr. Sauceda also claims Officer Albrecht should have told the issuing judge that when he found the silver Mercedes in the parking lot, Agent Glenn's visual inspection of the vehicle from the outside did not reveal anything

suspicious.  The addition of this fact would not have defeated probable cause.

Especially in light of the other information in the affidavit, indicating the

vehicle contained a secret compartment.  It only makes sense that if a drug

trafficker is going to go to the trouble of installing a secret compartment to

conceal and transport his contraband, he is probably not going to leave

contraband lying about in plain sight for all the world to see in a hotel parking

lot.  The Iowa judge was expected "to be only neutral and detached—not naïve

and ingenuous."  Reivich, 793 F.2d at 963.

The final omission Mr. Sauceda alleges should have been added to the

affidavit is that the drug dog was summoned to the Hard Rock and ran around

the Mercedes, but did not alert.  Agent Glenn testified to this fact during the

evidentiary hearing.  But Agent Glenn also testified that the Mercedes was not

searched until the warrant for the search arrived on the scene.  It is not clear

on this record when the dog sniff occurred.  It is also not clear whether or when

Officer Albrecht knew of the dog sniff.  Mr. Sauceda has not shown, therefore,

that this fact was purposefully omitted by Officer Albrecht.  Additionally, as

explained above, the evidence for which the officers were searching was not

only drugs but other evidence of drug trafficking which would not necessarily

have carried the odor of drugs to which a drug dog would have alerted

(firearms, records regarding co-conspirators, ledgers, etc.).  As to those items,

that the dog did not alert would have no effect whatsoever on the probable

cause determination.

For all of these reasons, the court maintains its initial determination that Mr. Sauceda did not carry his burden to show entitlement to a <u>Franks</u> hearing. As such, no <u>Franks</u> hearing was held.

### a. The Sioux City, Iowa Search Warrant Provided Probable Cause to Search the Vehicle and Hotel Room.

The Fourth Amendment requires that a search warrant may be issued only upon a showing of probable cause. <u>United States v. Williams</u>, 477 F.3d 554, 557 (8th Cir. 2007). A "reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists." <u>United States v. Williams</u>, 10 F.3d 590, 593 (8th Cir. 1993) (citing <u>Illinois v. Gates</u>, 462 U.S. 213, 236 (1983)). Further, affidavits supporting search warrants are considered presumptively valid. <u>Franks</u>, 438 U.S. at 171.

"Probable cause requires that the circumstances set forth in an affidavit supporting an application for a search warrant demonstrate a 'fair probability that contraband or evidence of a crime will be found in a particular place.' " <u>United States v. Tyler</u>, 238 F.3d 1036, 1038 (8th Cir. 2001) (quoting <u>Gates</u>, 462 U.S. at 238)). In determining whether probable cause exists, courts look to the totality of the circumstances and consider all the facts "for their cumulative meaning" rather than evaluating each fact independently. <u>Williams</u>, 10 F.3d at 593; <u>Tyler</u>, 238 F.3d at 1038. "Applications and affidavits for issuance of a warrant should be examined under a common sense approach and not in a hyper technical fashion." <u>Williams</u>, 10 F.3d at 593 (citing <u>United States v. Ventresca</u>, 380 U.S. 102, 109 (1965)). The key question in determining whether a search warrant is supported by a finding of probable cause is

whether, viewing all of the information collected by law enforcement as a whole, a "reasonable person could suspect that a search would uncover evidence of crimes committed by [the defendant]." Tyler, 238 F.3d at 1038.

The Supreme Court summarized the probable cause standard as follows:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to insure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

Gates, 462 U.S. at 238-39 (citation omitted).

Mr. Sauceda asserts the search warrant affidavit is insufficient because it is "bare bones" and contains no information about the credibility or reliability of the source of information who told law enforcement about the secret compartment in his silver Mercedes or that Mr. Sauceda had transported narcotics in the secret compartment. This much is true. But a commonsense reading of the affidavit requires the reader to also consider that Mr. Sauceda already had a federal arrest warrant outstanding for him in South Dakota for the crime of conspiracy to distribute a controlled substance. This means that a neutral, detached magistrate judge (in this case, this magistrate judge) had already determined there was probable cause to believe Mr. Sauceda had committed or was involved in the crime of conspiracy to distribute controlled substances. The Iowa judge surely reached the same conclusion. Therefore, the credibility of informants had already been determined as to that issue.

When search warrant affidavits are based upon information supplied by informants, the key question is whether such information is reliable. <u>United States v. Williams</u>, 10 F.3d 590, 593 (8th Cir. 1993).

> Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence. If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable.

<u>Id.</u> (citing <u>Gates</u>, 462 U.S. at 233-34; <u>Draper v. United States</u>, 358 U.S. 307, 313 (1959)).

Thus, an informant is considered to be reliable and credible if the supplied information is at least partially corroborated by other sources. <u>Humphreys</u>, 982 F.2d at 259; <u>see also</u> <u>United States v. Murphy</u>, 69 F.3d 237, 240 (8th Cir. 1995) (court held that search warrant was based on probable cause when the affidavit contained only (1) the informant's statement that the defendant was a recently-released convicted murderer who possessed illegal firearms at his residence and (2) the affiant's statement that he had confirmed the defendant's address and release from prison). Probable cause may be found, for example, when the information supplied by one informant is consistent with specific details provided by a second, independent informant. <u>United States v. Fulgham</u>, 143 F.3d 399, 401 (8th Cir. 1998). Thus, reciprocal corroboration may render informant information reliable and credible enough to support a finding of probable cause. <u>Id.</u>; <u>United States v. Nieman</u>, 520 F.3d 834, 839-40 (8th Cir. 2008).

Although the credibility and reliability of informants are important considerations in the probable cause inquiry, "they are not 'separate and independent requirements to be rigidly exacted in every case.' " Tyler, 238 F.3d at 1039 (quoting Gates, 462 U.S. at 230)). That is, an informant's statements must be weighed as part of the totality of the circumstances. Tyler, 238 F.3d at 1039. In addition, probable cause may be established by the observations of law enforcement and by circumstantial evidence. United States v. Wells, 223 F.3d 835, 839 (8th Cir. 2000).

Probable cause had already been determined as to Mr. Sauceda's involvement in distribution of controlled substances. The Sioux City Task Force affiant explained that, based on her training and experience, "drug traffickers keep in their possession drugs, drug proceeds, firearms, records of drug transactions, and records or indicia of co-conspirators, customers and suppliers in their possession for accessibility." See Exhibit 2, p. 3.

The affidavit explained that an unidentified source told South Dakota Sheriff's Detective Dan Christensen that Mr. Sauceda drove a silver Mercedes and that the Mercedes contained a secret compartment for the purpose of transporting drugs. The source indicated Mr. Sauceda had previously transported drugs to South Dakota in the Mercedes and had supplied the drugs to the subject. The source watched Mr. Sauceda operate the hidden compartment in the silver Mercedes to open it. Detective Christensen corroborated part of this detail when he told the affiant the drugs (6.5 pounds of methamphetamine and 1.7 pounds of cocaine) referenced by the unidentified

source were later seized by law enforcement.  The Sioux City Task Force corroborated another important detail provided by the unknown source.  They ran the license plates on the silver Mercedes in the Hard Rock parking lot and confirmed it was registered to Mr. Sauceda.

Ideally, the affidavit would have been more explicit about why the information was reliable.  But given the situation, it is understandable why the issuing judge found that probable cause existed.  The primary source of information providing information to the Sioux City law enforcement officer who drafted the affidavit was a member of the Sioux Falls Task Force who had already secured an arrest warrant, based upon probable cause, for Mr. Sauceda's involvement in distribution of controlled substances in South Dakota.  The unknown source, referred to by Detective Christensen, provided information solely about the silver Mercedes and the fact that it had been used by Mr. Sauceda to conduct the drug-related activities for which probable cause had already been found to exist.

That Mr. Sauceda in fact owned the silver Mercedes was corroborated by the Sioux City law enforcement personnel by running the license plates on the Mercedes.  Though owning a silver Mercedes is certainly not a crime, corroboration of the fact that Mr. Sauceda owned the silver Mercedes established that the source "was providing accurate information about verifiable details, and the fact that those corroborated details were not about criminal activity does not subtract from the probable cause analysis."  United States v. Faulkner, 826 F.3d 1139, 1145 (8th Cir. 2016) (citing United States v.

Ketzeback, 358 F.3d 987, 992 (8th Cir. 2004)) ("[Independent corroboration of even innocuous facts makes it more likely an informant is telling the truth about incriminating ones, and corroboration of innocent behavior can provide the basis for establishing probable cause.").

Lending the deference owed to the finding of the issuing judge, this court concludes there was a substantial basis for concluding that probable cause existed for the issuance of the warrants for Mr. Sauceda's vehicle and hotel room.  Williams, 10 F.3d at 593; Gates, 462 U.S. at 238-39.

**2.      The Issue Regarding the Warrant for Mr. Sauceda's Hotel Room is Moot Because No Evidence Was Found in Mr. Sauceda's Hotel Room**

Alternatively, the court finds the issue regarding the validity of the warrant for Mr. Sauceda's hotel room is moot.  This is because during the evidentiary hearing, counsel for the government indicated nothing of evidentiary value was found during the search of Mr. Sauceda's hotel room. Counsel for the government agreed that no evidence from the hotel room will be offered at trial.

**3.      The Warrant to Search Mr. Sauceda's Vehicle was Unnecessary Under the Automobile Exception**

The usual rule under the Fourth Amendment is that a valid search warrant supported by probable cause must first be obtained before a search is conducted.  California v. Carney, 471 U.S. 386, 390 (1985).  There are, however, a number of exceptions to the warrant requirement, including the automobile exception.  Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per

curium); <u>United States v. Caves</u>, 890 F.2d 87, 89 (8th Cir. 1989).  The Supreme

Court has held that the "ready mobility" of automobiles creates an exigency

that allows a warrantless search of an automobile where probable cause exists

to believe that the vehicle contains contraband or evidence of criminal activity.

<u>Labron</u>, 518 U.S. at 940; <u>Caves</u>, 890 F.2d at 89.  Aside from the mobility of

cars, the automobile exception to the warrant requirement is also supported by

the fact that citizens have a reduced expectation of privacy in an automobile

because automobiles are subject to pervasive regulation.  <u>Labron</u>, 518 U.S. at

940 (citing <u>Carney</u>, 471 U.S. at 390-391); <u>Caves</u>, 890 F.2d at 89.

 If probable cause exists in support of the automobile exception, the

search may encompass the entire passenger compartment of the automobile,

its trunk, and all containers, packages, and compartments located in the

vehicle so long as there is probable cause to believe that the object of the

search may be found there.  <u>Caves</u>, 890 F.2d at 90.  Probable cause requires

"only a probability or substantial chance of criminal activity, not an actual

showing of such activity."  <u>United States v. Neumann</u>, 183 F.3d 753, 756 (8th

Cir. 1999) (citing <u>United States v. Payne</u>, 119 F.3d 637, 642 (8th Cir. 1997),

(quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 243-244 n.13 (1983))).

 In the <u>Caves</u> case, the officer smelled the odor of burnt marijuana on the

person and the breath of the driver of a vehicle the officer had stopped for

speeding.  <u>Caves</u>, 890 F.2d at 90.  No odor of unburned marijuana was smelled

on the driver, nor did the officer detect any odor of marijuana of any kind

emanating from the driver's vehicle.  <u>Id.</u>  Under these circumstances, the driver

argued that the odor of burnt marijuana was evidence only that the driver had recently consumed marijuana; he argued that it did not give rise to probable cause to believe that there was any marijuana in the car. Id. The Eighth Circuit rejected this argument, noting that the driver had "just emerged from a vehicle driven from another state several hundred miles away," that the driver had just spent several hours riding in the automobile just prior to the stop, that the hour was late, and that the totality of these circumstances, in addition to the odor on the driver, gave rise to probable cause to believe that there would still be unused marijuana in the vehicle. Id. at 91.

In United States v. McCoy, 200 F.3d 582, 584 (8th Cir. 2000), the Eighth Circuit held that a strong smell of air freshener (a potential masking agent for the smell of illegal narcotics) coming from a vehicle, combined with the smell of burnt marijuana on the driver, was sufficient to give rise to probable cause for the search of the vehicle.

In Neumann, where the driver smelled of alcohol, lit a cigarette which the officer believed was being used to cover up the smell of alcohol, sat far away from the officer in the patrol vehicle up against the door, had a positive PBT, and admitting to drinking a beer in a town 60 miles away, the Eighth Circuit held that there was probable cause to believe that the driver consumed alcohol in the car and, thus, that a search for an open container in the car was justified. Neumann, 183 F.3d at 756. When the officer began searching the vehicle for open containers of alcohol, he smelled burnt marijuana, which in turn gave rise to probable cause to search the entire vehicle for drugs. Id.

The unifying analysis that ties <u>McCoy</u>, <u>Neumann</u>, and <u>Caves</u> together is *not* that the odor was emanating from the driver or from the car itself. Rather, the unifying justification for the search in each case was the presence of facts and circumstances that gave rise to the inference that drugs or alcohol had been consumed in the vehicle itself or were stored there and, hence, that they would probably still be present. <u>McCoy</u>, 200 F.3d at 584 (strong smell of air freshener emanating from the car); <u>Neumann</u>, 183 F.3d at 756 (odor of alcohol coupled with driver's admission of having drunk a beer 60 miles away from the scene of the stop); <u>Caves</u>, 890 F.2d at 91 (fact that driver still smelled of marijuana and had been riding in the car for several hundred miles). <u>See also United States v. Jennings</u>, 2007 WL 2142260, No. *1 (8th Cir. July 27, 2007) (unpublished) (per curiam) (holding that odor of burnt marijuana emanating from passengers and from interior of car justified search pursuant to the automobile exception because probable cause existed to believe that marijuana had been used in the car).[7] The facts in these cases gave rise to the inference that the car had been used to consume or store illegal drugs in large part because there was evidence that the car had just been driven a significant distance and, given the odor of marijuana on the driver or in the car itself, it was reasonable to assume that the marijuana had been consumed or stored in the car and, therefore, there might still be unused marijuana in the car.

---

[7]Although the Eighth Circuit did not select <u>United States v. Jennings</u> for publication in the Federal Reporter, the rules of Appellate Procedure which took effect January 1, 2007, provide that such decisions are nevertheless a proper subject for citation. <u>See</u> FED. R. APP. PRO. 32.1.

In United States v. Shackleford, 830 F.3d 751 (8th Cir. 2016), the court explained that probable cause to believe an automobile contains contraband or evidence of criminal activity has long been held to justify a warrantless search of an automobile and seizure of the contraband. Id. at 753. Probable cause for the warrantless search of an auto may be based on the collective knowledge of officers involved in the investigation, not just the officers on the scene. Id.

Shackleford explained the distinction between search incident to arrest, which was greatly circumscribed in Arizona v. Gant, 556 U.S. 332, 338 (2009), and the automobile exception. Shackleford, 830 F.3d at 753, n. 2. The Schackleford court explained:

> [The automobile exception] is distinct from the search-incident-to-lawful arrest exception at issue in Gant. In Gant, the Court narrowed the incident-to-arrest exception to situations where "the arrestee is unsecured and within reaching distance of the passenger compartment," or where there is "reason to believe evidence relevant to the crime of arrest might be found in the vehicle." 556 U.S. at 343 (quotation omitted). The automobile exception requires probable cause to believe contraband or evidence of *any* crime will be found in the vehicle, not merely reason to believe evidence of the crime of arrest will be found.

Shackleford, 830 F.3d at 753, n. 2.

While it is true that the search of the silver Mercedes occurred hours after Mr. Sauceda had been arrested and removed from the scene, that is of no moment in the analysis here. As explained in United States v. Castaneda, 438 F.3d 891 (8th Cir. 2006), while an automobile search that is conducted incident to *arrest* must be contemporaneous with the arrest, when the *automobile exception* applies, "the vehicle need not be immediately searched." Castaneda, 438 F.3d at 894 (explaining that when the vehicle is searched

pursuant to the automobile exception, officers may conduct a warrantless search even after the vehicle is impounded and in police custody). In Castaneda, the search of Mr. Castaneda's vehicle was upheld pursuant to the automobile exception after Mr. Castaneda was stopped and arrested on probable cause that he was involved in selling illegal narcotics. Id. at 892. Mr. Castaneda's vehicle, however, was not searched until it was taken back to the police department, long after Mr. Castaneda's arrest. Id.

Mr. Sauceda asserts the automobile exception should not apply because there were no exigent circumstances and his vehicle was not operable. He posits that because he was under arrest and the police had the keys to his vehicle, there was no danger that he (or anyone else) could drive away in his car.

First, the United States Supreme Court has clearly indicated that exigency is not a factor in determining whether the automobile exception applies. Maryland v. Dyson, 527 U.S. 465, 466 (1999) ("under our established precedent, the 'automobile exception' has no separate exigency requirement."). And as to whether the vehicle was readily mobile, that the police had the keys did not necessarily render the vehicle the vehicle inoperable.

Mr. Sauceda cites United States v. O'Connell, 408 F. Supp.2d 712 (N.D. Iowa 2005) to support his assertion that because his vehicle was not operable, the automobile exception should not apply. But that case is inapposite. In O'Connell, the vehicle which was searched was *not* the vehicle which Mr. O'Connell was driving when the police apprehended him, but a vehicle

parked close by, in which Mr. O'Connell was hiding.  Furthermore, and more importantly, the vehicle that was the subject of the search had been abandoned in a farm field for many years, had flat tires, was not licensed to traverse on the road, and was obviously not "readily mobile."  It was for that reason (not that the police had a set of keys) that the automobile exception did not apply.  Id. at 723.

That the police had the keys to Mr. Sauceda's Mercedes did not render it unable to traverse the public roadways, as was the vehicle in O'Connell.  It is common knowledge that most vehicles have more than one set of keys, or are able to be "hot wired."  Mr. Sauceda had told CI 43 that his associates were traveling right behind him.  It would not be unreasonable to think these associates had motive to possess the silver Mercedes and remove it.  Agent Glenn surely knew this, as he testified he remained with the vehicle (despite having the keys) until the warrant arrived at approximately 1:00 a.m.

In this case, there is no evidence that any of the Sioux City law enforcement officers smelled the odor of drugs or observed any drugs or drug paraphernalia in the silver Mercedes as it was parked in the Hard Rock parking lot.  However, this case is like McCoy, Neumann,  Caves  and Castaneda in that there had been a showing of probable cause that Mr. Sauceda was involved in distributing narcotics, and it had been positively established that Mr. Sauceda drove from Texas to Sioux City in the silver Mercedes.  A confidential informant told law enforcement that Mr. Sauceda used the silver Mercedes to transport the drugs in a secret compartment located within the silver Mercedes.  There

was, therefore,  the presence of facts and circumstances that gave rise to the inference that drugs or evidence of drug trafficking had been in the vehicle itself or were stored there and, hence, that they would probably still be present. As such, the automobile exception applied and no warrant was necessary to search the silver Mercedes.

**C.      Whether Mr. Sauceda's Recorded Phone Conversations with the CI Should Be Suppressed (Third Motion to Suppress, Docket 109)**

Finally, Mr. Sauceda moves to suppress the telephone conversations between himself and CI 43 which were recorded by Agent Glenn.  He argues the CI's consent to these recordings was not voluntary.  Pursuant to 18 U.S.C. § 2511(c), (the Electronic Communications Privacy Act or ECPA) "it shall not be unlawful under this chapter for a person acting under color of state law to intercept a wire, oral or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

Mr. Sauceda concedes, as he must, that law enforcement working with a confidential informant may record telephone conversations with a suspect without violating the suspect's Fourth Amendment rights when the conversation is recorded with the consent of the confidential informant. 18 U.S.C. § 2511(c); United States v. White, 401 U.S. 745, 751 (1971; United States v. Tangeman, 30 F.3d 950, 952 (8th Cir. 1994).   During the hearing, the court inquired of the parties whether Mr. Sauceda had standing to question the voluntariness of the *informant's* consent under 18 U.S.C. § 2511(c), and whether, even assuming Mr. Sauceda could show a violation of 18 U.S.C.

§ 2511(c), such a violation would necessarily rise to the level of a constitutional violation.

The statute provides the means for Mr. Sauceda to challenge the voluntariness of CI 43's consent to the recording. Specifically, 18 U.S.C. § 2518(10)(a) provides in relevant part:

> Any aggrieved person in any trial . . . before any court may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that (i) the communication was unlawfully intercepted . . .Such motion shall be made before trial.

See 18 U.S.C. § 2518(10(a). Further, 18 U.S.C. § 2510(11) defines an aggrieved person as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." Id.

Mr. Sauceda cites United States v. McMillan, 508 F.2d 101 (8th Cir. 1974), for the proposition that the informant's consent is invalid if not voluntary, and to establish voluntariness, the government must show "the conversation elicited was made  . . . in good faith, without any kind of inducement." Id. at 104.

In Tangeman, the court explained that the voluntariness of the informant's consent should be evaluated under the totality of the circumstances. Id. The government bears the burden of proving consent is voluntary. United States v. Corona-Chavez, 328 F.3d 974, 978 (8th Cir. 2003) (citing United States v. Gomez, 900 F.2d 43, 44 (5th Cir. 1990)).

The year after <u>McMillan</u>, the Eighth Circuit decided <u>United States v.</u>

<u>Rich</u>, 518 F.2d 980 (8th Cir. 1975).  In that case, the defendant (Mr. Rich)

challenged the admissibility of recorded conversations between himself and a

cooperating individual (Mr. Walsh) who had been promised immunity in

exchange for his cooperation, which included conducting recorded

conversations with Mr. Rich.  Mr. Rich argued the cooperator's consent was not

voluntary because of the government's promise of immunity.  <u>Id.</u> at 985.  The

court rejected this argument, and held the fact that Mr. Walsh became an

informant in exchange for immunity "in no way diminishes the voluntariness of

his consent to the monitoring of his conversations with the defendan[t]."  <u>Id.</u>

(punctuation altered, internal citation omitted).

In <u>United States v. Kelly</u>, 708 F.2d 121 (3d Cir. 1983), the court

acknowledged that determining whether a person's consent to the recording of

a phone conversation was voluntary is not a simple task.  <u>Id.</u> at 125.  Consent

is not voluntary if it is coerced, explicitly or implicitly, or by implied threat or

covert force.  <u>Id.</u>

> An individual's decision to allow the police to record a phone
> conversation, however, is not necessarily involuntary just because
> that individual's motives were self-seeking, or because he harbored
> expectations of personal benefit . . . Rather, consent will be
> considered voluntary if, from the totality of the circumstances, the
> trial court determines that the party agreeing to the wiretap did so
> consciously, freely, and independently and not as the result of a
> coercive overbearing of his will.

<u>Id.</u>

Likewise, in <u>United States v. Horton</u>, 601 F.2d 319 (7th Cir. 1979) the

court considered whether the possibility of a lighter sentence for the

cooperating subject rendered his consent to record telephone conversations involuntary.  Id. at 321.  The court decided it did not, because an informer's consent is incident to a course of cooperation with law enforcement officials on which the cooperator has already decided and entails no unpleasant consequences to the cooperator.  Id. at 321-22.  Therefore, the court announced, it will usually suffice for the government to simply show that the cooperator went ahead with the call knowing that it was being recorded.  Id.

The Horton court recognized if the cooperator is expecting benefits (the carrot) for cooperating that must mean conversely there would be penalties (the stick) in the form of criminal charges, for example for not cooperating.  Still, the possibility that non-cooperation would result in the imposition or worsening of criminal charges does not render consent involuntary.  Horton, 601 F.2d at 322.

> That which motivates the cooperation is the desire to change in a favorable manner the previously existing possibility, if not probability, of penalties.  This does not, in our opinion . . . constitute anything in the nature of overbearing the will.  There is no one in a better position than the informant to know whether there are facts which could be the basis of penalties.  The situation of consent, of course, might well be different if the consensual cooperation had been secured by actual threats of a physical nature or of prosecutorial action which had no realistic foundation. That is not the case before us.  Once it is shown that the cooperation has been undertaken, barring some affirmative evidence of will-overbearing coercive threats, we believe . . . that the participation in monitoring or recording a telephone or other conversation in which the informant is a participant is merely incidental to the previously determined course of cooperation with law enforcement officials.

Horton, 601 F.2d at 322-23.

The Eighth Circuit reached the same conclusion in 2003 when it held that neither the defendant's statutory nor constitutional rights were violated when his conversations with an informant were recorded. Corona-Chavez, 328 F.3d at 976. In that case, the police informant (Ms. Munoz) was arrested in possession of methamphetamine. She agreed to become an informant. Id. at 976-77. Her conversations with the defendant occurred in a hotel room and were video and audio taped. Id. at 977.

When Mr. Corona-Chavez challenged the admissibility of the recorded conversations, the court found the informant had consented to the recording, so they were admissible. Id. On appeal, the Eighth Circuit began by noting that the ECPA allowed the recording of conversations so long as one party to the conversation consents. Id. at 978. "When someone voluntarily participates in a telephone conversation knowing that the call is being intercepted, this conduct supports a finding of implied consent to the interception." Id. And, as to the videotaping, the court concluded that in these particular circumstances (the meeting occurred in a hotel room for the purpose of selling drugs, and the surveillance was conducted with the consent of the other party) no Fourth Amendment violation occurred. Id. (citing Minnesota v. Carter, 525 U.S. 83, 99-91 (1998); United States v. White, 401 U.S. 745, 752-53 (1971)).

Finally, in United States v. Oslund, 453 F.3d 1048 (8th Cir. 2006), the defendant (Mr. Oslund) argued his recorded conversations with an informant should be inadmissible because the informant was "induced" to cooperate under McMillan because the informant wanted to collect the $115,000 reward

money being offered.  The court discussed the statement in <u>McMillan</u> indicating that one of the factors to be considered in determining whether recorded conversations are admissible is whether the conversation was voluntary without any type of inducement.  <u>Oslund</u>, 453 F.3d at 1056.

The court explained that the inducement to which the <u>McMillan</u> court referred was of the *defendant* not the cooperator.  <u>Id.</u> (citing <u>United States v. Brown</u>, 604 F.2d 557, 560 (8th Cir. 1979); <u>United States v. Risken</u>, 788 F.2d 1361, 1370 (8th Cir. 1986)).  Because the court was presented with no evidence that the *defendant* (Mr. Oslund) did not voluntarily enter into the recorded conversations, or that *he* was somehow induced to do so, Mr. Oslund's argument failed.  <u>Oslund</u>, 453 F.3d at 1056.

The <u>Oslund</u> court likewise rejected Mr. Oslund's argument that the informant's consent to record the conversations was involuntary because the informant hoped to gain something by his cooperation--whether the money reward or a reduction in pending criminal charges.  The court cited <u>Kelly</u> in concluding that the informant's hope or expectation of personal gain or benefit did not render his consent involuntary.  <u>Id.</u>

The court has considered the totality of the circumstances in this case.  First, as in <u>Oslund</u>, there is no evidence that Mr. Sauceda did not participate in the conversations with CI 43 voluntarily or that he was induced to do so.  That he did not know he was being recorded does not equate to a finding that he did not voluntarily participate.  Agent Glenn explained that, at his specific instruction, the phone calls were a result of CI 43 returning Mr. Sauceda's

calls—not CI 43 initiating the conversations.  Mr. Sauceda was not induced into participation in the calls.

There is likewise no evidence whatsoever that CI 43 was physically threatened or coerced to cooperate with law enforcement.  Agent Glenn explained that CI 43 knew the calls with Mr. Sauceda would be recorded and consented to the recording.  CI 43's phone was put on "speaker" mode and placed next to the recording device on the console of the vehicle within plain view on each occasion that the calls were recorded.

 Agent Glenn unequivocally denied CI 43 was provided with any monetary compensation in exchange for her cooperation.  Agent Glenn also unequivocally stated that he explained to CI 43 though he would tell the prosecutor that CI 43 cooperated with law enforcement, he made no promises to CI 43 about what effect cooperation would have upon the charges ultimately brought against her or CI 44.  That CI 43 hoped to gain favor with the prosecutor and that she most certainly agreed to become an informant with the hope and expectation of facing lesser charges (and probably of being released on bond rather than being held in jail pending trial of whatever she was ultimately charged with) does not render her consent involuntary pursuant to Rich, Horton, and Oslund.  Rich, 518 F.2d at 985; Horton, 601 F.2d at 322-23; Oslund, 453 F.3d at 1056.    The recorded conversations between CI 43 did not violate 18 U.S.C. § 2511(c) or Mr. Sauceda's constitutional rights.8

---

8 The court assumes, without so holding, that the question of the voluntariness of CI 43's participate in the recorded calls rises to the magnitude of a constitutional issue.

The government has carried its burden to show CI 43's consent to record the conversations between herself and Mr. Sauceda was voluntary.

Mr. Sauceda's request to compel CI 43 to appear in open court to provide testimony for such a purpose is denied.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends denying Mr. Sauceda's motions to suppress [Docket Nos. 105, 107 and 109] in their entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 27th day of September, 2017.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge